# UNITED STATES DISTRICT COURT
for the
Eastern District of California

| | |
|---|---|
| United States of America<br>v.<br>MARTIN PARRAZ,<br>AKA, "SHOOTER,"<br><br>*Defendant(s)* | )<br>)<br>)  Case No. **1:23-mj-00011-SKO**<br>)<br>)<br>)<br>) |

**FILED**
Jan 24, 2023
CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.
On or about the date(s) of **January 16, 2023** in the county of **Tulare** in the **Eastern** District of **California**, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 USC 841(a)(1) | Possession With Intent to Distribute 50 Grams and More of Methamphetamine and a Mixture and Substance Containing a Detectable amount of Heroin |
| 18 USC 922(g)(1) | Felon in Possession of a Firearm |
| 18 USC 922(g)(1) | Felon in Possession of Ammunition |

This criminal complaint is based on these facts:

See Attached Affidavit of DEA SA Shawn Riley, attached hereto and incorporated herein.

☑ Continued on the attached sheet.

_____
*Complainant's signature*

Shawn Riley, DEA Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 1/24/2023

_____
*Judge's signature*

City and state: Fresno, California    Sheila K. Oberto, U.S. Magistrate Court Judge
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　　　Plaintiff,<br><br>　　　v.<br><br>MARTIN PARRAZ, JR.,<br>　aka, "SHOOTER,"<br><br>　　　　　　　Defendant. | CASE NO.<br><br>AFFIDAVIT OF DEA SPECIAL AGENT SHAWN RILEY |

I, Shawn Riley, Special Agent, being sworn, depose and state the following:

## I.　INTRODUCTION

1.　I am a Special Agent (SA) of the United States Department of Justice, Drug Enforcement Administration (DEA). I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant. I have been employed as a Special Agent with the Drug Enforcement Administration (DEA) since January 2004 and am presently assigned to the Drug Enforcement Administration Resident Office in Fresno, California. I have successfully completed a sixteen (16) week DEA Basic Agent Training Academy at the Drug Enforcement Administration Academy in Quantico, Virginia. This training included instruction in the investigation of Federal drug violations, including, but not limited to Title 21, United States Code Sections 841 and 846. I have discussed with numerous law enforcement officers, defendants, and informants, the methods and practices used by narcotics distributors.

2.　Based on this training and conversation with more senior law enforcement agents, I am familiar with narcotics traffickers' methods of operation including the distribution, storage, manufacturing, and transportation of narcotics and the collection of money proceeds of narcotics trafficking.

3.　I have participated in narcotics investigations either as a case agent or in a supporting role. I have debriefed defendants, informants, and witnesses who had personal knowledge regarding

narcotics trafficking organizations. Additionally, I have participated in drug investigations including, but not limited to, undercover operations and conducting physical surveillance. I have conducted and been involved in investigations regarding the unlawful manufacture, possession, distribution, and transportation of controlled substances, as well as conspiracies associated with criminal narcotics, in violation of Title 21, United States Code, §§ 841(a)(1), 841(c)(2), 843, and 846 and the State of California Health and Safety Code.

4. Since this affidavit is in support of a complaint alleging violations of Title 18, United States Code, Section 922(g)(1), Felon in Possession of a Firearm; and Title 18, United States Code, Section 922(g)(1), Felon in Possession of Ammunition, I am also relying on the training and experience of ATF Group Suipervisor Eric Pennman which is described as follows.

5. GS Pennman completed twenty-seven weeks of training, which was comprised of the Criminal Investigator Training Program and the ATF Special Agent Basic Training program at the Federal Law Enforcement Training Center and ATF National Academy in Glynco, Georgia. GS Pennman received extensive training in firearm identification, the identification and effects of controlled substances, the identification of improvised explosive devices, surveillance and electronic surveillance, and undercover investigations. During the course of GS Pennman's employment with ATF, he has received training in and participated in various investigations, including those involving criminal street gangs, narcotics, firearms, violent crimes, etc. During these investigations, GS Pennman has participated in and utilized investigative tools including, but not limited to, physical surveillance, conducting interviews, writing affidavits for and executing arrest and search warrants, handling confidential informants, analyzing phone records obtained from pen registers, trap and trace devices, and physical devices, and collecting and processing evidence. Through GS Pennman's training and experience as a law enforcement officer, he has become familiar with the firearms manufacturing/dealing sub-culture including knowledge of how individuals who are engaged in the business of manufacturing and/or dealing firearms without a license operate. During the course of GS Pennman's duties with ATF, he has examined hundreds of firearms and thousands of rounds of ammunition for the purpose of determining the manufacturer, model, caliber/gauge, and serial number; the place of manufacture; function and design; and/or status as related to the National Firearms Act and

the Gun Control Act.  In December of 2019, GS Pennman attended the ATF Interstate Nexus Expert training course in Huntsville, Alabama.

6. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

7. This affidavit is in support of a complaint charging Martin PARRAZ (referred to hereinafter as "PARRAZ") with violations of Title 21, United States Code, Section 841(a)(1), (b)(1)(A), Possession with Intent to Distribute 50 Grams and More of Methamphetamine (actual) and Heroin; Title 18, United States Code, Section 922(g)(1), Felon in Possession of a Firearm; and Title 18, United States Code, Section 922(g)(1), Felon in Possession of Ammunition.  The information set forth in this affidavit is not intended to detail each and every fact and circumstance of the investigation or all the information known to me and other law enforcement investigators. Rather, this affidavit serves only to establish probable cause for the arrest of PARRAZ.

## II. PROBABLE CAUSE

### A. Initial encounter with PARRAZ.

8. On January 16, 2023, Tulare County Sheriff's Office (referred to hereinafter as "TCSO") Deputies were looking for PARRAZ to speak to him regarding a crime that occurred early that morning. Detctive Lucio L. Cobos, III spoke with individuals familiar with PARRAZ.  They directed him to a location in Goshen (referred to hereinafter as the "Subject Location" instead of with the precise address which is unnecessary to establish probable cause), said that they had seen PARRAZ go in and out of the residence two to three times that day, and that he was living in the garage of the Subject Location.  They said PARRAZ was traveling via his motorcycle with his girlfriend, and that they had last seen PARRAZ at around 4:00 p.m.  Detective Cobos learned from TCSO dispatch that PARRAZ had an active felony warrant for a parole violation.  When detectives, including Det. Cobos, arrived at the Subject Location at approximately 7:30 PM, detectives saw PARRAZ walking from his motorcycle to the front door of the residence.  PARRAZ went into the residence and closed the door.  Detectives called for him to come out.  Det. Cobos knocked on the front door and heard a female yell something through the door.  Det.

1 Cobos announced himself as being with the Sheriff's Department.  Det. Garcia told Det. Cobos he could hear unknown noises coming from the window directly South of the front door (later determined to be coming from the dining room/ kitchen area).

9. Det. Cobos heard a male voice asking what the detectives wanted.  Det. Cobos said they wanted to speak with him regarding the recent crime.  PARRAZ then opened the front door a short time later.  Detectives took PARRAZ into custody.  PARRAZ initially resisted and refused to put his hands behind his back.  PARRAZ removed his cell phone from his pocket and threw it towards his girlfriend.  The phone slid on the floor under the couch.  PARRAZ complied and was placed into handcuffs.  Det. Cobos then asked PARRAZ's girlfriend for his phone.  She told the detectives they could get it themselves.  TCSO Detectives then retrieved the Subject Phone which Martin PARRAZ had discarded.

B. **Search of the Subject Location and First Search of the Chrysler 300.**

10. During a subsequent search of the residence occurring shortly after the discussion with PARRAZ's girlfriend regarding his phone, detectives found a Smith & Wesson M & P Bodyguard revolver, serial number CZX2216 loaded with 5 rounds of .38 Special ammunition (four of the five rounds are Winchester and one of the five rounds is stamped "R.P") in a drawer in the stove beneath the oven along with an additional six rounds of PMC .38 Special ammunition next to it.  At that point the detectives stopped searching and obtained a search warrant.  Det. Morales saw a live round of ammunition in the dining room that was one two two feet from the garage door.  That was a PMC .38 Special ammunition.  On January 16, 2023, the Honorable Antonio Reyes, Tulare County Superior Court Judge, issued a search warrant authorizing a search of the Subject Location as well as associated vehicles.  During the initial search of the Chrysler 300 at the Subject Location, an additional 36 rounds of .38 Special ammunition were located in the passenger door jam of the vehicle (35 of the 36 rounds are are manufactured by "CBC" and one of the 36 rounds is manufactured by "PMC").   Also located in the garage was plastic bag containing a white crystalline substance as well as a Pyrex type container with white residue.  The Pyrex type container is approximatley six inches long, approximatley four inches long, and approximatley one inch deep.  A presumptive test conducted on the white crystalline substance showed no controlled substance.  However, the white residue on the Pyrex type container tested presumptive positive for methamphetamine.

COMPLAINT AFFIDAVIT                                      4

11. It was concluded that PARRAZ had access to the Subject Location based on the initial information received by deputies indicating PARRAZ was with his girlfriend and PARRAZ' girlfriend's address of record per California DMV is the Subject Location. Furthermore, upon arrival at the Subject Location, deputies located PARRAZ' Chrysler 300 parked in the garage of the Subject Location. Deputies also observed PARRAZ walk from his motorcycle which he parked at the Subject Location and entered prior to being contacted.

12. The Chrysler 300 located at the Subject Location is believed to be PARRAZ' vehicle based on the following information. On January 3, 2023, family members who were since deceased told Deputy Matt Askew that PARRAZ had a Chrysler 300. On January 16, 2023, the Honorable Antonio Reyes, Tulare County Superior Court Judge, issued a search warrant for PARRAZ's cell phone (Subject Phone) which he previously threw under the couch at the Subject Location and was seized. Additionally, pursuant to the search warrant, detectives reviewed data from the Subject Phone. In two separate WhatsApp messages in January 2023, PARRAZ referred to the Chrysler 300 as his vehicle. The first occurred on January 12, 2023 and is as follows: "My 300 is burnt so I hope it doesn't rain to much because I'm going to be on the Harley PERRES ... "G"" The second occurred on January 14, 2023 and is partially as follows: "I spent the day working on my 300 and getting things back in order…"

C. **Jail call with PARRAZ and his girlfriend about the search of the Subject Location and the 300 suggesting additional contraband was in the 300.**

13. On January 17, 2023, Tulare County Sheriffs Office Det. Cobos reviewed a recorded jail phone call between PARRAZ and his girlfriend. This call occurred after the search warrant described above. PARRAZ's girlfriend told PARRAZ that detectives towed the motorcycle and car. PARRAZ immediately asked why the car was towed, and she replied she did not know. PARRAZ said, "Well it's not my car." His girlfriend responded that she knew but that it was already towed. PARRAZ repeated himself slower, "OK, that's not my car." His girlfriend replied, "OK." Det. Cobos believed the context, tone and tenor of the call suggested PARRAZ was trying to get a message to his girlfriend that she should say the vehicle does not belong to him.

14. It should also be noted that PARRAZ's girlfriend's son is the registered owner of the Crysler 300. The registration lists the address of the Subject Location. Based on my training and

COMPLAINT AFFIDAVIT                    5

experience, I know that individuals who are engaged in drug trafficking commonly use cars that are not registered in their own names. Therefore, this information is not inconsistent with the Chrysler 300 being PARRAZ' vehicle,

15. During the same jail phone call, PARRAZ's girlfriend started to discuss the firearm seized during the search warrant at the Subject Location. A synopsis of this partion of the conversation is below:

> Girlfriend: Uh, and they found the thing in the house.
>
> PARRAZ: Who got charged with it?
>
> Girlfriend: Huh?
>
> PARRAZ: So who did they charge for anything?
>
> Girlfriend: Nobody got charged with anything yet. I wasn't here when they found it.
>
> PARRAZ: Where were you?
>
> Girlfriend: I went to, they told me I could go and I went to (Unk possibly Gordo's) they had already towed shit, you know what I mean? Fuckin', there was no reason to fuckin' . . .
>
> PARRAZ: What'd they find in the house? I don't, you don't, I don't . . . look baby.
>
> Girlfriend: The burner.
>
> PARRAZ: Oh, what's his name's thing? That's not mine, I don't care.
>
> Girlfriend: Yeah.
>
> PARRAZ: I mean.
>
> Girlfriend: That's why I said, I'll take that. But uh, the fucking um . . . the other shit that was in the trunk.
>
> PARRAZ: Aye, I don't know nothing.
>
> Girlfriend: I know.

16. Based on my training and experience, knowledge of this investigation, and context of the use of the terms "thing" and "burner," I believe "thing" and "burner" both refer to the Smith & Wesson M & P Bodyguard revolver investigators found at the Subject Location in the drawer in the stove. I know that individuals who are engaged in drug trafficking, illegal firearms possession and other criminal activity commonly use coded words to avoid detection by law enforcement. I also know that "thing"

COMPLAINT AFFIDAVIT                          6

and "burner" are commonly used by these individuals to refer to a firearm.  I concluded that PARRAZ' girlfriend informed PARRAZ of the seizure of the firearm because it was in fact his.

### D.  Second search warrant and search of the 300.

17.  In the same conversation, PARRAZ' girlfriend referened "the other shit that was in the trunk."  Based on this statement, investigators believed their may be additional evidence in PARRAZ' Chrysler 300 and authored a search warrant for the vehicle.  On January 17, 2023, the Honorable Antonio Reyes, Tulare County Superior Court Judge, issued a search warrant for the Chrysler 300.  On the same date, Tulare County HIDTA Det. Jeff Dowling participated in a second search of the Chrysler 300, which was stored at a tow yard in Tulare, CA.  Det. Dowling found a black bag in the trunk.  Inside, he found a gallon-size plastic bag that contained two smaller plastic bags with what Det. Dowling recognized, based on his training and experience, as methamphetamine.  He also found sticky notes, an address book, and dozens of zip lock bags in quarter and half dollar sizes in the bag, as well as a plastic container that contained a small amount of methamphetamine and a small spoon that appeared to be used to scoop out methamphetamine.  Det. Dowling found a blue band aid container behnd a speaker box in the trunk, and inside of that he found what he recognized as black tar heroin based on appearance and odor (a strong odor similar to vinegar).  Based on my training and experience, I know that individuals engaged in street-level drug dealing commonly use small zip lock bags to parcel out gram and less than gram amounts of controlled substances for sale.  Det. Dowling also found a digital scale that had white crystalline residue on it.  Based on my training and experience, I believe the scale was used to weigh narcotics for sale.  Det. Dowling conducted a presumptive test on the suspected controlled substances using a "NIC kit," and the white substance tested positive for methamphetamine and the black substance tested positive for heroin.  Based on my training and experience, I believe that the methamphetamine and heroin were possessed for purpose of distribution to others based on the amount[1], the presence of the scale and the presence of the small baggies.  Additionally, I believe that the methamphetamine contains 50 grams and more of actual methamphetamine given the purity of methamphetamine in the Tulare County area.  Based on my training and experience, I know that the

---

[1] The gross weight of the seized suspected methamphetamine to be 146.93 gross grams and the seized suspected heroin to be 56.14 gross grams.

COMPLAINT AFFIDAVIT                                      7

large majority of methamphetamine seized and tested by DEA in Tulare County and surrounding counties is often greater than 80% purity, and almost always greater than 50% purity. As such, I believe the actual methamphetamine in the substance amounts to 50 grams and more.

18.   Det. Dowling searched the inside of the Chrysler 300, and found an additional seven .38 Special caliber "PMC" brand rounds of ammunition in a small black mesh bag on the passenger's side of the center console. This is ammunition that is used with a .38 Special firearm, e.g., the Smith & Wesson M & P Bodyguard .38 Special revolver found inside of the Subject Location. Inside the trunk of the Chrysler 300, Detectives also found a piece of mail addressed to Martin PARRAZ, dated March 17, 2022. This indicia further confirmed the vehicle and contents thereof belonged to PARRAZ.

19.   As set forth in greater detail above, I believe that PARRAZ has and uses a Chrysler 300 vehicle ("the 300"), and that items inside of the 300, including .38 Special ammunition, heroin, methamphetamine, baggies, a scale, a letter, and other items belong to PARRAZ. In summary, I base this belief on facts set forth herein, including statements family members made to a detective regarding the 300 being PARRAZ's vehicle, 2 WhatsApp messages dated in January 2023 in which PARRAZ refers to the 300 as his, a letter addressed to PARRAZ that investigators found in the 300, and the fact that the 300 was parked in front of the residence when investigators encountered PARRAZ at the residence on January 16, 2023.

E.   **Interstate nexus of the Smith & Wesson M & P Bodyguard .38 Special revolver and .38 Special ammunition.**

20.   On January 21, 22, and 23, 2023, I spoke with ATF SA Eric Penman, who has specialized training in the identification and manufacture of firearms and ammunition. SA Penman advised me that the Smith and Wesson, M & P Bodyguard .38 Special Revolver as well as all of the .38 Special ammuntion described above was manufactured outside of California and therefore traveled in and affected interstate commerce.

F.   **PARRAZ' prior felony convictions.**

21.   I reviewed Tulare County and Kern County Superior Court records, and found that PARRAZ suffered the following felony convictions punishable by more than a year imprisonment:

a)   Tulare County Superior Court CR31150-A, Felony Possession of a Controlled Substance

While Armed, in violation of California Health and Safety Code, Section 11370.1 on or about April 11, 1997;

b)      Tulare County Superior Court CR330890A, Felony Exhibit Firearm in Presence of a Peace Officer, in violation of California Penal Code, Section 417(c), and was sentenced to 3 years prison on April 11, 1997;

c)      Tulare County Superior Court VCF206836B, Felony Prohibited Person in Possession of Ammunition in violation of California Penal Code, Section 12316(b)(1) and Evading a Peace Officer: Disregard Safety, in violation of California Vehicle Code, Section 2800.2 and was sentenced to 5 years and 4 months imprisonment on September 30, 2002;

d)      Tulare County Superior Court VCF070967-01, Felon in Possession of a Firearm, in violation of California Penal Code, Section 12021(a)(1), and was sentenced to 2 years prison on May 20. 2010;

e)      Riverside County Superior Court RIF1100706, Felony Possession of a Controlled Substance for Sale in Violation of California Health and Safety Code, Section 11351 conviction on August 5, 2011;

f)      Tulare County Superior Court VCF272081, Felony Manufacture, Import, Etc. a Short-Barreled Rifle in violation of California Penal Code, Section 33215 and was sentenced to 32 months imprisonment on October 4, 2012;

g)      Tulare County Superior Court VCF302127B, Discharge Firearm in Negligent Manner in violation of California Penal Code, Section 246.3 and Street Gang Act Street Terrorism in violation of California Penal Code2, Setion 186.22(b)(1)(A) and was sentenced to a total of five years in prison on May 28, 2015;

h)      Tulare County Superior Court VCF313316, Felony Assault with a Deadly Weapon with Force: Possible Great Bodily Injury ini violation of California Penal Code, Section 245(a)(4) and was sentenced to 5 years imprisonment on May 28, 2015;

i)      Kern County Superior Court DF013178-A, Felony Prisoner in Possession of a Weapon, in violation of California Penal Code, Section 4502(a) and sentenced to 6 years of imprisonment on March 12, 2018.

COMPLAINT AFFIDAVIT                                9

22. Furthermore, PARRAZ knew he had been convicted of a felony offense punishable by more than a year imprisonment at the time of the instant offense, January 16, 2023 as he previously has been sentenced to more than a year imprisonment on numerous occasions as noted above.

## CONCLUSION

23. I believe the above facts set forth probable cause to believe that Martin PARRAZ is in violation of Title 21, United States Code, Section 841(a)(1), (b)(1)(A), Possession with Intent to Distribute 50 Grams and More of Methamphetamine (actual) and Heroin; Title 18, United States Code, Section 922(g)(1), Felon in Possession of a Firearm; and Title 18, United States Code, Section 922(g)(1), Felon in Possession of Ammunition. I request that an arrest warrant be issued for Martin PARRAZ for these offenses.

_____
Shawn Riley
Spceial Agent, Drug Enforcement Administration

Affidavit submitted to me by reliable electronic means and attested to me as true and accurate by telephone consistent with Fed. R. Crim. P. 4.1, 4(d), and 41(d)(3) this __24th__ day of January, 2023.

_____
Hon. Sheila K. Oberto
United States Magistrate Judge

Reviewed as to form by

/s/ Kimberly A. Sanchez
Kimberly A. Sanchez
Assistant U.S. Attorney

COMPLAINT AFFIDAVIT                                    10